IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 18-40145-1 |
| Plaintiff, | |
| vs. | REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A) |
| TERRELL MAURICE BRUNSTON, | |
| Defendant. | |

Terrell Maurice Brunston, by and through his attorney, Chief Appellate Attorney Molly C. Quinn, respectfully submits this reply in support of his pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The unprecedented and extraordinary risk posed by the global COVID-19 pandemic satisfies the "extraordinary and compelling reasons" standard under § 3582(c)(1)(A)(i). Mr. Brunston suffers from a number of serious health conditions that the CDC has identified as risk factors for COVID-19 and is currently incarcerated at Lompoc FCI, which is the hardest hit facility in the country. Mr. Brunston requests a sentence of time served and, if the court deems necessary, a period of time on home confinement as a condition of supervised release.

## BACKGROUND

On December 3, 2019, Mr. Brunston was sentenced to 35 months in custody and 4 years of supervised release for bank robbery. He has been in custody since December 18, 2018. PSR ¶ 4. His current release date is July 3, 2021. *See* https://www.bop.gov/inmateloc/ (Register No. 77353-112). He will be eligible to serve the remaining portion of his sentence on home detention beginning on March 20, 2021. Doc. 53, p. 90.

Mr. Brunston suffers from a number of serious chronic health conditions, including Type 2 diabetes, asthma, hypertensive heart disease with heart failure, hypertension, sleep apnea, epilepsy/seizure disorder, and kidney disorder. Doc. 53, pp. 6, 9-10, 23, 31, 41-42; *see also* PSR ¶ 59. He is incarcerated at Lompoc FCI. *See* https://www.bop.gov/inmateloc/ (Register No. 77353-112). On April 18, 2020, Lompoc FCI reported its first 2 positive cases of COVID-19 among inmates. As of May 10, 2020, the BOP reported 862 positive cases of COVID-19 among inmates (842 active and 20 recovered) and 14 positive cases among staff (11 active and 3 recovered). *See* https://www.bop.gov/coronavirus/ (last accessed May 11, 2020). This is an astronomical 43,000 percent increase in inmate cases over this 22-day period.

On April 20, 2020, Mr. Brunston filed a pro se motion for compassionate release (or in the alternative, home confinement under the CARES Act). Doc. 47. On April 28, 2020, the government filed a response in opposition to Mr. Brunston's motion, arguing that Brunston's motion is premature and that the court does not have jurisdiction to designate Brunston to home confinement. Doc. 48. Through counsel, Mr. Brunston now submits this reply. This is a High Priority case under Paragraph 4 of Standing Order 20-06.

## ARGUMENT

Under Section 603(b) of the First Step Act of 2018, this court has the power to grant Mr. Brunston's motion for compassionate release:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction . . .

2

and that such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i). The statutory requirements for a sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

## I.      Mr. Brunston has satisfied the statutory exhaustion requirement.

Section § 3582(c)(1)(A) provides that the court has the power to reduce the defendant's term of imprisonment based on the defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Mr. Brunston submitted a request for compassionate release on April 15, 2020. His motion is not premature.

Further, in light of the unprecedented global COVID-19 pandemic, a growing number of courts have excused the exhaustion requirement on equitable grounds. In this case, the court can avoid the exhaustion issue by entering an order reducing Mr. Brunston's sentence on May 15, 2020, which is 30 days after he submitted a request for compassionate release to prison staff.

### A.      Mr. Brunston submitted a request for compassionate release (his second) to prison staff on April 15, 2020; the very latest this court can act is May 15, 2020.

Mr. Brunston has diligently attempted to pursue his administrative remedies with the BOP. He first requested release due to COVID-19 via electronic communication at some point in March or early April 2020. *See* Doc. 50-1. He does not have access to a copy of this request due to lockdown conditions at the prison.

On April 15, 2020, Mr. Brunston submitted another request for compassionate release based on his vulnerability to COVID-19. Doc. 53, pp. 1-5. He handed this form to prison staff. But his request wasn't stamped as received by the Warden's office until April 23, 2020, which was 8 days after Mr. Brunston submitted it to prison staff. Doc. 53, p. 1.

Then, on April 29, 2020, 14 days after Mr. Brunston submitted his request to staff and 6 days after the Warden stamped the request as received, BOP counsel informed the United States Attorney's Office for the District of South Dakota that Lompoc FCI did ***not*** have a request for compassionate release from Mr. Brunston, but that they would consider the letter filed with the court that day (*see* Doc. 50-1) as received on April 29.[1] But Mr. Brunston had already submitted a request, and the Warden had already stamped it as received. The information provided by BOP counsel to the United States Attorney's Office was inaccurate and out of date.

Regardless of whether the court finds that the exhaustion requirement is a jurisdictional requirement or a claims processing rule and whether it is mandatory, waivable by the government, or excusable by the court, Mr. Brunston's 30-day clock started running on April 15, 2020, the day he handed his form to prison staff. The fact that the Warden did not stamp it as received until 8 days later should not be held against him. Mr. Brunston did not have direct access to the Warden or the Warden's office. He could not control how long it took for his handwritten request to make it to the Warden's office and then to make it to the Warden's desk to be stamped as "received." He had no way of even knowing when that took place. Mr. Brunston did everything he could on April 15, 2020.

---

[1] Assistant United States Attorney Stephanie M. Bengford provided this information to the undersigned by email on April 29, 2020. To be clear, it appears that counsel for both parties first had access to a copy of Mr. Brunston's April 15 request when the probation office obtained a copy under Paragraph 5 of Standing Order 20-06. *See* Doc. 95, p. 1 (filed May 8, 2020). The breakdown in communication happened somewhere in the BOP, not by the United States Attorney's Office in this case.

4

At least one court has found that the 30-day clock starts on the day the defendant submitted his request for compassionate release to prison staff, regardless of when it was stamped received by the Warden's office:

> Resnick submitted a request for compassionate release under 18 U.S.C. 3582(c) on or about February 26, 2020. It was not stamped received by the warden's office until March 16, 2020.
>
> . . .
>
> Resnick filed his request with the warden on February 26, well over 30 days ago. He personally handed it to his counselor, a representation the Government has not disputed. This is typically the only mechanism by which an inmate can communicate with the warden's office. Inmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk. While the form now contains a stamp indicating that it was "received" on March 16, 2020, the stamped date is not the operative trigger for the 30-day time period under 18 U.S.C. § 3582(c). The statute does not say, "30 days, plus an additional 2.5 weeks until the form is formally accepted by the warden's office." Resnick submitted this to his counselor, the warden's representative.
>
> The situation is analogous to the "prisoner mailbox rule," which provides that an inmate's papers are deemed filed the day that they are signed and given to prison officials for mailing. *See Houston v. Lack*, 487 U.S. 266, 276, 282 (1988) (defining the prison mailbox rule); *see also Hardy v. Conway*, 162 Fed. Appx. 61 (2d Cir. 2006) ("in the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing"). Applying the prisoner mailbox rule, the counselor's receipt of the document constituted the warden's receipt of the documents.

*United States v. Resnick*, __ F. Supp. 3d. __, No. 14 CR 810 (CM), 2020 WL 1651508, at *5-6 (S.D.N.Y. Apr. 2, 2020). This is the only rule that makes sense, and the court should apply it here.

At the very latest, this court has the power and authority to grant Mr. Brunston's motion on May 15, 2020.[2]

---

[2] To be clear, the 30-day lapse provision governs when the court can act on the motion, not, as the government argues, when the defendant can *file* a motion. The statute does not require that the defendant wait 30 days to file a motion with the court. Instead, it allows "the court" to "reduce the term of imprisonment" after the "lapse of 30 days from the receipt of such request by the warden." *See* 18 U.S.C. § 3582(c)(1)(A). Contrast this with the language of the Prison Litigation Reform Act of 1995, which states, "[n]o action shall be brought . . . until such administrative remedies are as

**B.      The court should excuse the exhaustion requirement.**

As an alternative, this court should excuse the exhaustion requirement on equitable grounds. At the outset, § 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional. For a rule to be jurisdictional, Congress must clearly state that it is. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). "Absent such a clear statement . . . courts should treat the restriction as nonjurisdictional in character." *Id.* (internal quotation omitted). Section 3582(c)(1)(A) does not clearly state that the exhaustion of administrative remedies and/or the lapse of 30 days is jurisdictional. Thus it is simply a claims processing rule. *See id.* at 154.

The question of whether § 3582(c)(1)(A) allows the court to excuse the exhaustion requirement hinges on congressional intent and statutory construction. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 n.2 (2016) ("Of course, an exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions."). In deciding whether Congress intended to recognize equitable exceptions to § 3582(c)(A)(1), the court should apply the "general[] presum[ption] that Congress legislates against the backdrop of the common law." *Comcast Corporation v. National Association of African American-Owned Media, et. al.*, 140 S. Ct. 1009, 1016 (2020); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 10-11 (2014) ("[T]he inquiry begins with the understanding that Congress 'legislate[s] against a background of common-law adjudicatory principles' . . . Congress is presumed to incorporate equitable tolling into the federal statutes of limitations because equitable tolling is part of the established backdrop of American law.") (internal citations omitted).

---

available are exhausted." 42 U.S.C. § 1997e(a). Unlike the PLRA, § 3582(c)(1)(A) does not forbid the filing of a motion until after certain conditions are satisfied. *See, e.g.*, *United States v. Spears*, No. 3:98-cr-0208-SI-22, 2019 WL 5190877 (D. Or. Oct. 15, 2019) (granting compassionate release motion on October 15, 2019 where the defendant submitted his request to the BOP and filed with the court on September 13, 2019).

Because equitable considerations such as futility are well-established common law exceptions to administrative exhaustion, the Supreme Court has held that, "where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (emphasis added). As a result, even if the court finds that the congressional intent in § 3582(c)(1)(A) is muddled or ambiguous, that would counsel in favor of applying an equitable exception and deciding Mr. Brunston's motion on the merits. The court should decline to rule on the merits only if it finds that Congress clearly intended to require the lapse of 30 days even in cases or under circumstances where it would be futile or life-threatening.

Section 3582(c)(1)(A) does not contain any indicia of such a harsh and uncompromising legislative intent. To the contrary, the current language of the provision was passed under the heading, "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-91, 132 Stat. 5339 (2018). The title of the provision is relevant to the question of whether Congress intended the provision to be subject to equitable exceptions. *See, e.g.*, *INS v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving ambiguity in the legislation's text."). As one court analyzing the statute in an analogous case explained, "nothing in the statutory scheme suggests that Congress intended to preclude the court from exercising judicial discretion and to take into account timeliness and exigent circumstances related to why the defendant seeks compassionate release." *United States v. Guzman Soto*, No. 1:18-CR-10086-IT, 2020 WL 1905323, at *5 (D. Mass. Apr. 17, 2020).

In the compassionate release context, courts have excused a defendant's failure to exhaust administrative remedies in three circumstances:

> (1) Exhaustion may be unnecessary where it would be futile, either because agency decision-makers are biased, the agency has already determined the issue, or the agency's standards prelude relief.

7

(2) Exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief.

(3) Exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice.

*See, e.g.*, *United States v. Scparta*, ___ F. Supp. 3d ___, No. 18-CR-578 (AJN), 2020 WL 1910481, at *4-8 (S.D.N.Y. Apr. 20, 2020) (reversing previous decision on exhaustion and excusing failure to comply with exhaustion requirement on equitable grounds); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020) (excusing failure to exhaust where undue delay could risk catastrophic health consequences for defendant, rendering exhaustion process futile and inadequate); *United States v. Perez*, No. 17 Cr. 513-3 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (same); *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement.").

All three exceptions apply in Mr. Brunston's case. First, given the situation in the BOP, requiring Mr. Brunston to wait any longer to submit his motion would be futile. Inmates across the country are reporting that BOP staff are no longer accepting or reviewing written requests for release and are instructing inmates to file directly with the court. *See* Doc. 50-1 (Mr. Brunston's explanation that the BOP is so short-staffed that case managers and counselors are not available or responding to inmate requests); Affidavit of Lyle Wilson, *United States v. Lyle Wilson*, No. 5:08-cr-50051-KES (D.S.D. May 1, 2020), ECF No. 680-1 (stating that Duluth FPC warden instructed all inmates that BOP staff would not be responding to inmate requests and encouraging inmates to file requests with the court). Communications from BOP and other prison staff confirm these reports. *See, e.g.*, Motion for Compassionate Release, *United States v. Michael Wayne Person*, No. 3:18-cr-00250-HTW-FKB (S.D. Miss. Apr. 1, 2020), ECF No. 61, p. 11 (noting that defendant's case manager

informed defense attorney that on March 31, 2020, "her superiors advised her not to turn in any [compassionate release] paperwork until the BOP figured out how to respond to the ever-developing COVID-19 situation"); Memorandum from D. Patrick, CI Taft (Apr. 6, 2020), *available at* https://www.fd.org/sites/default/files/2020.04.06-_taft_memo.pdf (informing inmates that "[d]ue to the number of Requests to Staff received, individual responses will not be provided, nor will any future requests regarding this same matter be addressed"). BOP staff are understandably overwhelmed and unable to respond to inmate requests in a timely manner. Requiring Mr. Brunston to go through the administrative remedy process or to wait for a response that will never come would be futile.

Second, the BOP's program statement on compassionate release does not recognize COVID-19 as a permissible basis for compassionate release. Program Statement 5050.50 – Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) was updated in January 17, 2019. It does not cover the COVID-19 pandemic. Wardens are openly disclosing that "the current pandemic of the COVID-19 virus in the community is not a qualifying factor" that the BOP will consider. *See, e.g.*, *United States v. Louis F. Petrossi*, No. 17-cr-192-CCC (M.D. Penn. Apr. 9, 2020), ECF No. 124-4. It is clear that no inmate will ever receive compassionate release on the basis of COVID-19 through a motion by the BOP.

And third, requiring Mr. Brunston to pursue additional agency review (or to dismiss his motion and require him to refile it at a later date) would result in undue prejudice. There are 862 cases of COVID-19 at Lompoc FCI. Mr. Brunston has a number of the most dangerous underlying health conditions for COVID-19. His life is genuinely at risk, and his request for release cannot wait. *See Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1174 (7th Cir. 2010) ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no

9

'possibility of some relief' and so nothing for the prisoner to exhaust."). There are no available administrative rights in Mr. Brunston's situation.

Finally, as set forth above, to the extent the court has any hesitation about its authority to excuse the exhaustion requirement, it can order that Mr. Brunston be released effective May 15, 2020 which would be a full 30 days from Mr. Brunston's request for compassionate release.

**II.    Mr. Brunston's health conditions during the COVID-19 global pandemic amount to an extraordinary and compelling reason to reduce his sentence to time served.**

Section 3582(c)(1)(A)(i) provides that the sentencing court may grant compassionate release based on "extraordinary and compelling reasons." While this phrase is not defined in the statute, the present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes. Based on his myriad of health problems, Mr. Brunston is among those at heightened risk of exposure to COVID-19 in custody. This is an extraordinary and compelling reason for his immediate release.

**A.    The court has authority to find "extraordinary and compelling reasons" other than those expressly identified in the commentary to USSG § 1B1.13.**

At the outset, this court is not restricted to the definition of "extraordinary and compelling reasons" set out in the Sentencing Guidelines or by the Bureau of Prisons. Before the enactment of the First Step Act of 2018, Congress delegated to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement issued in exercise of that authority, USSG § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served,

and (4) compelling family circumstances. USSG § 1B1.13, comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. USSG § 1B1.13, comment. n.1(D).

Section 1B1.13, however, was last amended in November 2018, before the enactment of the First Step Act of 2018. *See* USSG § 1B1.13 (still requiring that a motion be filed by the director of the BOP). Because the First Step Act changed the way a compassionate release motion may be brought, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the current statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the district court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original). *See also United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020) (finding that because § 1B1.13 applies to motions filed by the BOP director, not motions filed by defendants, there does not currently exist an "applicable policy statement").

Further, even where courts have not deemed § 1B1.13 entirely inapplicable, they have held that judges have the authority under the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the

district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)); *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). A growing number of courts have done so based on the defendant's susceptibility to COVID-19 in prison. *See, e.g.*, *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *10 (S.D. Iowa Apr. 29, 2020)

Accordingly, this court has the authority to consider whether Mr. Brunston's medical conditions during the COVID-19 global pandemic present an extraordinary and compelling basis for a sentence reduction, regardless of whether they fall within one of the circumstances set out in Application Note 1(A) through (C). For the reasons set forth below, they do.

  **B.** **COVID-19 is an unprecedented global health emergency that presents serious risk to vulnerable prisoners like Mr. Brunston.**

As of May 11, 2020, the COVID-19 pandemic has infected over 1.3 million people in the United States, leading to at least 79,000 deaths.[3] As quickly as COVID-19 is spreading across the country, it is spreading even more quickly through the federal prison system. The cumulative rate of rise in COVID-19 cases in the BOP is nearly double that of the national cumulative rate of rise.[4]

---

[3] The New York Times, *Coronavirus Map: Tracking the Global Outbreak*, *available at* https://tinyurl.com/wdp4dym (updated regularly) (last accessed May 11, 2020).

[4] *See* Federal Defenders of New York, *BOP COVID-19 Charts and Graphs 5.10*, p. 3, *available at* https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.5.10.pdf (last accessed May 11, 2020).



**Graph: Cumulative Rate of Rise of Covid-19 Infections (comparing BOP rate with US rate)**



As of May 10, 2020, at least 48 inmates have died in the custody of the BOP.[5]

"COVID-19 is a serious disease," which "makes certain populations of people severely ill." Declaration of Chris Beyrer, MD, MPH ("Beyrer Decl.") ¶ 5 (Exhibit A); Declaration of Dr. Jonathan Louis Golob ("Golob Decl.") ¶ 3 (Exhibit B).[6] The CDC has determined that individuals with certain medical conditions, including lung disease, heart disease, diabetes, blood disorders, chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, pregnancy, and being immunocompromised (due to cancer, HIV, and autoimmune diseases) are at increased risk of serious complications from COVID-19. Golob Decl. ¶ 3. "The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection," and "varies significantly depending on the presence of certain demographic and

---

[5] *See* BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed May 11, 2020).

[6] These declarations were prepared in connection with litigation unrelated to the instant case, and were previously filed as exhibits to the defendant's Expedited Motion to Revoke Detention Order, No. 1:19-cr-341-DCN (D. Idaho March 18, 2020). In the interests of transparency, counsel has left the Pacer filing information on each document.

health factors." Beyrer Decl. ¶¶ 5-6. "In the highest risk populations, the case fatality rate is about 15%." Golob Decl. ¶ 4.

Further, COVID-19 is highly infectious. "[O]nly the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity." Breyer Decl. ¶ 10. "Nationally, without effective public health interventions, CDC projections indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections." Golob. Decl. ¶10.

The conditions of confinement only contribute to the spread of the disease.[7] Indeed,

> [c]ongregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

Declaration of Dr. Jaimie Meyer, *Chunn et al. v. Edge*, No. 1:20-cv-01590-RPK, ECF No. 12-11 (E.D.N.Y. Mar. 30, 2020) at ¶ 9 (Exhibit C). And public health measures like social distancing and increased hygiene are "extremely difficult" in a custodial setting. Breyer Decl. ¶ 17 ("While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain."). "Given the experience in China as well as the literature on infectious diseases

---

[7] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *available at* https://tinyurl.com/wwy6gjk.

in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely." Beyrer Decl.

¶ 19.[8]

For these reasons, a number of lawmakers have called for all reasonable measures to be

taken to reduce the prison population and to release pregnant, elderly, and other high-risk inmates.[9]

This is necessary to "protect the health of inmates, the health of correctional facility staff, the health

of health care workers at jails and other detention facilities, and the health of the community as a

whole." Beyrer Decl. ¶ 19.

Mr. Brunston has a number of health conditions that render him especially vulnerable to

COVID-19. His medical records show that he has:

- Type 2 diabetes
- Asthma
- Hypertensive heart disease with heart failure
- Hypertension
- Sleep apnea
- Epilepsy/seizure disorder
- Kidney disorder

Doc. 53, pp. 6, 9-10, 23, 31, 41-42; *see also* PSR ¶ 59. He takes a number of medications to manage

these conditions. Doc. 53, pp. 6, 25.

---

[8] *See also* Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), *available at* https://tinyurl.com/wbgdk3v.

[9] *See, e.g.*, Letter from Chairman Jerrold Nadler & Rep. Karen Bass to Attorney General Barr (Mar. 30, 2020), *available at* https://tinyurl.com/vdmkrlo (urging immediate moves to "release medically-compromised, elderly, and pregnant prisoners"); Letter from Chairman Jerrold Nadler & Rep. Karen Bass to Attorney General Barr (Mar. 19, 2020), *available at* https://tinyurl.com/r4n5nsg (urging release of "federal inmates who are vulnerable to COVID19 (for instance, persons who are pregnant, who are 50 years old and older, and who suffer from chronic illnesses like asthma, cancer, heart disease, lung disease, diabetes, HIV, or other diseases that make them vulnerable to COVID-19 infection)").

These conditions render Mr. Brunston particularly high-risk. *See* Golob Decl. ¶ 3. According to a recent analysis by the CDC, "people with chronic conditions including diabetes, lung disease and heart disease appear to be at higher risk of severe illness from COVID-19."[10] The CDC found that 78 percent of patients requiring hospitalization in the intensive care unit had at least one underlying condition, and 94 percent of hospitalized patients who died had at least one underlying condition.[11] Of the patients admitted to the ICU, 32 percent had diabetes, 29 percent has heart disease, 21 percent had chronic lung disease (including asthma, COPD, and emphysema), and 37 percent had other chronic conditions including hypertension.[12]

Mr. Brunston is incarcerated in a facility with hundreds of confirmed cases under conditions that are perfectly conducive to the spread of the disease and entirely unconducive to any self-protective measures the general public can take. This is an extraordinary and compelling reason within the meaning of § 3582(c)(1)(A) and USSG § 1B1.13, Note 1(D). A number of courts have granted compassionate release under similar circumstances. *See, e.g.*, *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (finding extraordinary and compelling circumstances where the defendant suffered from Type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma); *United States v. Williams*, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372, at *4 (D. Conn. Apr. 24, 2020) (granting compassionate release where defendant had asthma, hypertension, diabetes, and other health conditions that placed him at greater risk from COVID-19) (also listing cases).

---

[10] Allison Aubrey, *Who's Sickest from COVID-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to-increased-risk.

[11] *Id.*

[12] *Id.*

C.      **Mr. Brunston also meets the criteria under USSG § 1B1.13, Application Note 1(A)(ii).**

While not necessary for relief in this case, it is worth noting that Mr. Brunston also meets the criteria for "extraordinary and compelling reasons" under the "Medical Condition of the Defendant" category in the Guidelines. Application Note 1(A) provides that extraordinary and compelling reasons exist where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13, Note 1(A)(ii)(I). The combination of Mr. Brunston's serious chronic medical conditions and his inability to adequately provide self-care to prevent contracting COVID-19 meets this standard. *See, e.g.*, *United States v. Sanchez*, No. 3:18-cr-140, 2020 WL 1933815, at *5 (D. Conn. Apr. 22, 2020) (finding extraordinary and compelling reasons where the defendant's underlying medical conditions made him more likely to contract COVID-19 and develop serious complications, which would substantially diminish his ability to provide self-care within the prison environment).

III.    **The 18 U.S.C. § 3553(a) factors support a sentence of time served.**

Finally, a reduction of Mr. Brunston's sentence to time served is consistent with the applicable § 3553(a) factors as well as the policy statements issued by the Sentencing Commission. Mr. Brunston was convicted of bank robbery in this case. But he was not the instigator of the offense. His co-defendant was in charge of the robbery, was the one who gave the orders, and was the one who carried the gun. *See* PSR ¶¶ 10-12. Mr. Brunston was not aware they were going to rob a bank until moments before the offense began. PSR ¶ 18. Yet he admitted his involvement, pleaded guilty, and accepted responsibility for his conduct. PSR ¶¶ 6, 18.

Mr. Brunston received a 35-month sentence for this offense. He has been in custody since December 18, 2018. PSR ¶ 4. He is currently incarcerated in a low security facility. He has not had

any disciplinary violations during his time in BOP custody. Doc. 53, p. 95. Before the facility went on lockdown status, he was enrolled in at least two courses. Doc. 53, p. 94. Under normal circumstances, he would begin serving the halfway house portion of his sentence in approximately 10 months. *See* Doc 53, p. 90. There is no reason for his 35-month sentence to become a death sentence because of COVID-19. A sentence of time served would be sufficient, but not greater than necessary to accomplish the goals of federal sentencing. *See* 18 U.S.C. § 3553(a).

Further, any concern about danger to the community could be addressed by a period of home confinement as a condition of supervised release. While this court cannot order the BOP to designate Mr. Brunston to serve the remainder of his custodial sentence on home confinement, it can reduce his sentence to time served, extend his term of supervised release, and impose a period of home confinement as a condition of supervision. *See* 18 U.S.C. § 3582(c)(1)(A); *see also, e.g.*, *United States v. Sanchez*, No. 3:18-cr-140, 2020 WL 1933815, at *6-7 (D. Conn. Apr. 22, 2020) (granting motion for compassionate release, reducing sentence to time served, increasing period of supervised release, and requiring home detention for first 13 months of that release); *United States v. Burrill*, __ F. Supp. 3d __, No. 17-cr-491, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020) (reducing sentence to time served and ordering that the remaining portion of defendant's original term of imprisonment to be "served as supervised release with the special condition that [defendant] shall be subject to home confinement"); *United States v. Williams*, No. 3:04-cr-95, 2020 WL 1751545, at *3-5 (N.D. Fla. Apr. 1, 2020) (reducing sentence to time served and adding as a condition of supervised release that the defendant be subject to one year on home confinement with electronic monitoring). Mr. Brunston would agree to abide by any such condition.

Finally, Mr. Brunston has a safe and stable place to stay if released from custody. He plans to live with his fiancé, Shalana Johnson, in Fontana, California.[13] Ms. Johnson is willing and able to pick Mr. Brunston up directly from the prison. Mr. Brunston can then self-isolate or self-quarantine at home for any period the court deems necessary. Promptly releasing Mr. Brunston from prison is the safest possible outcome for Mr. Brunston, other inmates, and society as a whole. *See Burrill*, 2020 WL 1846788, at *3.

## CONCLUSION

For these reasons, Mr. Brunston respectfully requests an order reducing his sentence to time served under 18 U.S.C. § 3582(c)(1)(A). Because continued incarceration during the rapidly-expanding COVID-19 pandemic puts his life and health at risk, he respectfully requests expedited consideration of his motion.

Dated this 11th day of May, 2020.

Respectfully submitted,

JASON J. TUPMAN
Federal Public Defender
By:

  /s/   *Molly C. Quinn*
Molly C. Quinn, Chief Appellate Attorney
Office of the Federal Public Defender
Districts of South Dakota and North Dakota
200 W. 10th Street, Suite 200
Sioux Falls SD 57104
Phone: (605) 330-4489; Fax: (605) 330-4499
filinguser_SDND@fd.org

---

[13] Mr. Brunston will provide Ms. Johnson's address and phone number to Probation upon request.

19